09 CV 3030

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WYOMING STATE TREASURER, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. |
| | CLASS ACTION COMPLAINT |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| v. | |
| MERRILL LYNCH & CO., INC., MERRILL LYNCH MORTGAGE LENDING, INC., MERRILL LYNCH MORTGAGE INVESTORS, INC., MERRILL LYNCH MORTGAGE INVESTORS TRUST, SERIES 2006-A1, MERRILL LYNCH MORTGAGE INVESTORS TRUST, SERIES 2006-WMC1, MERRILL LYNCH MORTGAGE INVESTORS TRUST, SERIES 2006-WMC2, MERRILL LYNCH MORTGAGE INVESTORS TRUST, SERIES 2006-AHL1, MERRILL LYNCH MORTGAGE INVESTORS TRUST, SERIES 2006-RM3, MERRILL LYNCH MORTGAGE INVESTORS TRUST, SERIES 2006-FM1, MERRILL LYNCH MORTGAGE INVESTORS TRUST, SERIES 2006-MLN1, MERRILL LYNCH MORTGAGE INVESTORS TRUST, SERIES 2006-RM5, MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-2, MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-3, MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-4, MERRILL LYNCH PIERCE FENNER & SMITH, INC., FIRST FRANKLIN FINANCIAL CORPORATION, MOODY'S INVESTOR SERVICE, INC., McGRAW-HILL COMPANIES, MATTHEW WHALEN, PAUL PARK, DONALD C. HAN, MICHAEL M. McGOVERN, DONALD J. PUGLISI and BRIAN T. SULLIVAN, |  |
| Defendants. | |

**TABLE OF CONTENTS**

I.    SUMMARY OF THE ACTION ........................................................................... 1

II.   JURISDICTION AND VENUE .......................................................................... 4

III.  THE PARTIES ................................................................................................... 5

      A.    Plaintiff ................................................................................................. 5

      B.    Defendants ............................................................................................. 5

IV.   FACTUAL BACKGROUND ............................................................................. 9

V.    DEFENDANTS MISREPRESENTED THE STANDARDS AND PROCEDURES
      USED IN UNDERWRITING AND, THUS, THE QUALITY AND ASSOCIATED
      RISKINESS OF THE UNDERLYING MORTGAGE LOANS ...................................... 12

      A.    Representations and Omissions Regarding Underwriting Standards and Loan
            Practices Used by the Loan Originators ................................................... 13

      B.    Representations And Omissions Regarding Home Appraisal Standards And
            Practices Used When Originating Mortgage Loans ................................... 14

      C.    Representations and Omissions Regarding Loan Characteristics ........................ 15

      D.    Representations and Omissions Regarding the Certificates' Credit Ratings ........ 16

VI.   SPECIFIC EXAMPLES OF DEFENDANTS' MATERIAL MISSTATEMENTS AND
      OMISSIONS IN THE OFFERING DOCUMENTS ............................................... 16

      A.    Merrill Lynch Mortgage Investors Trust, Series 2006-A1 .................... 16

      B.    Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2 ............................ 26

VII.  CLASS ACTION ALLEGATIONS ................................................................ 30

## I.     SUMMARY OF THE ACTION

1.     Plaintiff Wyoming State Treasurer ("Wyoming" or "Plaintiff") brings this securities class action on behalf of itself and all persons or entities who purchased or otherwise acquired the asset-backed or mortgage pass-through certificates (the "Certificates") issued pursuant or traceable to the untrue and misleading registration statements, prospectus supplements and other offering materials incorporated into the registration statements (collectively, the "Offering Materials") filed by Merrill Lynch Mortgage Investors, Inc. ("MLMI") and the Issuing Trusts (as defined below), and described herein.

2.     This action, which involves solely strict liability and negligence-based claims brought pursuant to the Securities Act of 1933 (the "Securities Act"), is being brought against defendants Merrill Lynch & Co., Inc. ("Merrill Lynch"), MLMI, Merrill Lynch Mortgage Lending, Inc. ("MLML"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"), First Franklin Financial Corporation ("First Franklin"), McGraw-Hill Companies ("McGraw-Hill"), Moody's Investors Service, Inc. ("Moody's"), the Individual Defendants (as defined below) and the Issuing Trusts (as defined below).

3.     MLMI is a Delaware corporation and a limited purpose, indirect wholly owned subsidiary of Merrill Lynch.  MLMI was formed in order to acquire and pool mortgage loans and other assets for securitization and sale as mortgage-backed securities ("MBS"), most commonly through the sale of asset-backed or mortgage pass-through certificates (hereafter, sometimes referred to simply as "certificates").  In recent years, MLMI, Merrill Lynch and their related entities (collectively, "Merrill") issued billions of dollars of certificates pursuant to several registration statements and related prospectuses.

4.     Merrill sold certificates backed by pools of residential mortgage loans which, in

turn, were originated by various lenders.  The value of these certificates was based on the quality of the underlying mortgage loans, as well as the loan collateral (*i.e.*, the residential property).

5.     Accordingly, the certificates were generally divided into several classes or "tranches," each carrying different priorities in terms of seniority and payment and, thus, risk exposure to defaults on the underlying loans.  Typically, the senior tranches carried the highest credit ratings, while more junior tranches received lower credit ratings.  These credit ratings were intended to signify the level of risk associated with a particular class of certificates and, thus, were extremely significant to investors.

6.     On August 5, 2005, MLMI filed with the Securities and Exchange Commission ("SEC") on Form S-3 a registration statement under the Securities Act, SEC File Number 333-127233 (the "August 2005 Registration Statement").  The August 2005 Registration Statement, which was later amended on Form S-3/A on August 17, 2005, indicated MLMI's intention to sell approximately fifteen-billion dollars ($15,000,000,000) in MBS through an as-then-undetermined number of issuing trusts.

7.     On December 21, 2005, MLMI filed with the SEC on Form S-3 a registration statement under the Securities Act, SEC File Number 333-130545 (the "December 2005 Registration Statement").  The December 2005 Registration Statement, which was later amended on February 24, 2006, March 21, 2006 and March 28, 2006, indicated MLMI's intention to sell approximately thirty-five billion dollars ($35,000,000,000) in MBS through an as-then undetermined number of issuing trusts.

8.     On February 2, 2007, MLMI filed with the SEC on Form S-3 a registration statement under the Securities Act, SEC File Number 333-140436 (the "February 2007 Registration Statement").  The February 2007 Registration Statement, which was later amended

on March 6, 2007, indicated MLMI's intention to sell approximately eighty-five billion dollars ($85,000,000,000) in MBS through an as-then undetermined number of issuing trusts.

9.      The August 2005 Registration Statement, December 2005 Registration Statement and February 2, 2007 Registration Statement are collectively referred to herein as the "Registration Statements."

10.      Generally, and as discussed in greater detail below, the prospectus supplements for the MBS offerings (the "Offerings") represented that the underlying mortgage loans were subject to certain underwriting and appraisal standards, that they had certain objective characteristics, and that they carried certain ratings attributed to them by the credit rating agencies.

11.      As further alleged below, these representations were untrue or misleading in a number of ways, including because the underlying mortgage loans were not in fact originated in accordance with the stated underwriting or appraisal guidelines, nor did the credit ratings or reported loan characteristics — *e.g.*, average loan-to-value ("LTV") ratios or borrower credit scores — accurately reflect the underlying mortgage loans or the risks associated with them.

12.      Indeed, once lenders began selling mortgages for securitization (as opposed to servicing them for the life of the loan), many abandoned their underwriting and appraisal standards in order to make more loans that they could then turn around and sell to banks like Merrill for inclusion in MBS.  This phenomenon was exacerbated by Merrill, which began pushing lenders for more and more mortgages that it could purchase for its MBS-related offerings.

13.      In the end, the loan origination practices of these lenders become so lax that borrowers were being extended loans, with little or no down payment, based on mortgage

applications containing stated incomes and assets that were impossible to reconcile with the applicants' purported employment.

14.    Not surprisingly, several of the originators utilized by Merrill for its MBS are being sued and/or investigated with respect to their mortgage lending practices.

15.    Ultimately, once mortgage defaults and foreclosures began to climb as result of these careless loan practices, the certificates' credit ratings were eventually downgraded and demand for them dwindled.  As a result, the certificates are no longer marketable at prices anywhere near the prices paid by Plaintiff and the Class (as defined below), and those who continue to hold them are exposed to far greater risk than previously represented.

## II.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.  Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) and (c).  Many of the acts and conduct complained of herein occurred in substantial part in this District.

17.    In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

### III.    THE PARTIES

#### A.    Plaintiff

18.    Plaintiff Wyoming State Treasurer manages and invests all funds of the State of Wyoming (with the exception of the State Retirement Fund).  Plaintiff currently manages over $10 billion in non-pension funds.  Plaintiff purchased or otherwise acquired the Certificates pursuant and traceable to the registration statements, prospectuses and prospectus supplements referenced herein and consequently suffered damages.  Plaintiff's Certification, attached to this complaint as Exhibit A, details its relevant purchases.

#### B.    Defendants

19.    During the relevant time period, Defendant Merrill Lynch & Co., Inc. was a Delaware corporation with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York.  Merrill Lynch was a global financial services firm, providing investment banking and brokerage services for retail, institutional and governmental customers.  Merrill Lynch's name appears on the first and final page of the prospectus supplements for the Offerings.  In January 2009, Merrill Lynch was acquired by Bank of America Corporation.

20.    Defendant Merrill Lynch Mortgage Lending, Inc. is a Delaware corporation with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York.  MLML is an indirect wholly owned subsidiary of Merrill Lynch.  MLML acted as the "Sponsor" in the securitization and offering of the Certificates.  As such, MLML acquired mortgage loans, transferred them to the "Depositor" which, in turn, transferred the mortgage loans to the issuing entities for securitization and public offering.  According to the Offering Materials, "MLML [also] work[ed] with rating agencies, mortgage loan sellers and servicers in structuring the securitization process."  MLML qualifies as an underwriter and a control person

of the Offerings.

21.    Defendant Merrill Lynch Mortgage Investors, Inc. is a Delaware corporation with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York.  MLMI is an indirect wholly owned subsidiary of Merrill Lynch.  MLMI acted as the "Depositor" in the securitization and offering of the Certificates.  As such, MLMI received mortgage loans from MLML which MLMI transferred to the issuing entities for securitization and public offering.  MLMI appears on the Registration Statements and qualifies as an issuer of the Offerings.

22.    Defendants Merrill Lynch Mortgage Investors Trust, Series 2006-A1, Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2, Merrill Lynch Mortgage Investors Trust, Series 2006-WMC1, Merrill Lynch Mortgage Investors Trust, Series 2006-AHL1, Merrill Lynch Mortgage Investors Trust, Series 200 6-RM3, Merrill Lynch Mortgage Investors Trust, Series 2006-FM1, Merrill Lynch Mortgage Investors Trust, Series 2006-MLN1, Merrill Lynch Mortgage Investors Trust, Series 2006-RM5, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3 and Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4 (collectively, the "Issuing Trusts") were created and structured by MLMI to issue the certificates pursuant to the Offerings Materials.  The Issuing Trusts received mortgage loans from the Depositor, MLMI.  The Issuing Trusts then securitized and offered the Certificates, based on the value of the mortgage loans, to investors.

23.    Defendants Merrill Lynch, MLMI and the Issuing Trusts, are collectively referred to herein as the "Issuing Defendants."

24.    Defendant Merrill Lynch Pierce Fenner & Smith, Inc. is a Delaware corporation

with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York.  MLPFS is a wholly owned subsidiary of Merrill Lynch.  MLPFS acted as an underwriter for the Offerings by participating in the drafting and dissemination of the Offering Materials.  MLPFS is also listed as an underwriter in the Offering Materials.

25.     Defendant First Franklin Financial Corporation is a subsidiary of Merrill Lynch Bank & Trust Co. with its principal place of business located at 2150 North First Street, San Jose, California.  First Franklin was the originator for many of the offerings at issue.  First Franklin also, however, acted as the "Sponsor" in the securitization and offering of certain certificates.  As such, First Franklin originated and/or acquired mortgage loans and transferred them to the "Depositor" which, in turn, transferred the mortgage loans to the issuing entities for securitization and public offering.  First Franklin also worked with rating agencies, mortgage loan sellers and mortgage loan servicers in the securitization process.

26.     Defendant Moody's Investor Service, Inc. is a division of Moody's Corp., a Delaware Corporation with its principal place of business located at 250 Greenwich Street, New York, New York.  Moody's provides credit ratings, research and risk analysis to investors.  As described in the Offering Materials, Moody's worked with MLML, mortgage loan sellers and mortgage loan servicers to structure the securitization transactions related to the Certificates.  Moody's qualifies as an underwriter of the Offerings and participated in the drafting and dissemination of the prospectus supplements referenced herein.

27.     Defendant McGraw-Hill Companies is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York.  Standard & Poor's ("S&P"), a division of McGraw-Hill, provides credit ratings, research and risk analysis to investors.  As described in the Offering Materials, S&P worked with MLML, mortgage loan

sellers and mortgage loan servicers to structure the securitization transactions related to the Certificates. S&P qualifies as an underwriter of the Offerings and participated in the drafting and dissemination of the Offering Materials.

28.     Defendants McGraw-Hill (including S&P) and Moody's are collectively referred to herein as the "Ratings Agency Underwriters."

29.     Defendants MLML, MLPFS, Moody's and McGraw-Hill are collectively referred to herein as the "Underwriting Defendants."

30.     Defendant Matthew Whalen ("Whalen") was, at relevant times, President and Chairman of the Board of Directors of MLMI. Defendant Whaled signed the August 2005 and December 2005 Registration Statements referenced herein.

31.     Defendant Paul Park ("Park") was, at relevant times, President and Chairman of the Board of Directors of MLMI and signed the February 2007 Registration Statement.

32.     Defendant Donald C. Han ("Han") was, at relevant times, Treasurer of MLMI. Defendant Hand signed the August 2005 Registration Statement referenced herein.

33.     Defendant Michael M. McGovern ("McGovern") was, at relevant times, a Director of MLMI, a Director of Merrill Lynch and Senior Counsel of Merrill Lynch. Defendant McGovern signed the August 2005, December 2005 and February 2007 Registration Statements referenced herein.

34.     Defendant Donald J. Puglisi ("Puglisi") was, at relevant times, a Director of MLMI. Defendant Puglisi signed the August 2005, December 2005 and February 2007 Registration Statements referenced herein.

35.     Defendant Brian T. Sullivan ("Sullivan") was, at relevant times, Vice President and Treasurer of MLMI. Defendant Sullivan signed the December 2005 and February 2007,

Registration Statements.

36.     Defendants Whalen, Park, Han, McGovern, Puglisi and Sullivan are collectively referred to herein as the "Individual Defendants."

## IV.    FACTUAL BACKGROUND

37.     A mortgage-backed pass-through certificate is a security that represents a direct ownership interest in a pool of mortgage loans.  The servicer of the mortgage loans collects the monthly principal and interest payments from borrowers, then passes them onto an investment bank (minus a servicing fee), which in turn passes them onto the certificate holders.  Thus, the certificate entitles the holder to income payments derived from the pool of mortgage loans.

38.     Given the structure of how these certificates result in payment to their holders, the quality of the investment is necessarily dependent on the quality of the mortgage loans backing the certificates and, in the event of default or foreclosure, the value of the underlying property.

39.     The first step in creating a mortgage-backed pass-through certificate is to designate a "Sponsor," which, for the certificates at issue here, was either MLML or First Franklin.  The Sponsor selects and acquires the pool of mortgage loans from the loan originators based on the credit quality of the mortgage loans.  This process is often done in conjunction with the ratings agencies, originators and loan servicers to ensure the appropriate mix of loans is selected and so that specific credit ratings will be achieved for particular tranches.

40.     In the Offering Materials, MLML's role as Sponsor is described as follows:

> MLML acquires mortgage loans and initiates their securitization by transferring the mortgage loans to the Depositor or another entity that acts in a similar capacity as the Depositor, which loans will ultimately be transferred to the issuing entity for the related securitization.  In coordination with [MLPFS], MLML works with rating agencies, mortgage loan sellers and servicers in structuring the securitization transaction.

41.     MLML is further described in the Offering Materials as a "Transacting Party" and

states that it is responsible for "mortgage loan due diligence":

> Prior to acquiring any residential mortgage loans, MLML [Merrill Lynch Mortgage Lending, Inc., the Sponsor] conducts a review of the related mortgage loan seller that is based upon the credit quality of the selling institution. MLML's review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion and/or background checks. The scope of the mortgage loan due diligence varies based on the credit quality of the mortgage loans.

> The underwriting guideline review entails a review of the mortgage loan origination processes and systems. In addition, such review may involve a consideration of corporate policy and procedures relating to state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and/or material investors.

42.     Next, the Sponsor initiates the securitization by transferring the mortgage loans to a "Depositor," which, for the certificates at issue here, was MLMI. The Depositor, through a series of privately negotiated transactions with various sellers, acts as a depositor of trusts for the entities that ultimately issue the certificates secured by, or representing interests in, the assets of the trust (*i.e.*, the pool of mortgage loans). In this case, the issuing entities were the Issuing Trusts.

43.     The Depositor typically owns 100% of the beneficial interest in the issuing entity and is usually the parent or a wholly owned subsidiary of the parent which initiates the transaction.

44.     Once the Depositor has acquired the mortgage loans, the securitization process involves the pooling and repacking of the cash flow which will emanate from the mortgage loans into tranches. Each tranche has a different level of credit protection or risk exposure such that any losses from the underlying loans are realized according to level of seniority. Thus, in the event that the underlying loans become insufficient to make payments to the certificate holders — *i.e.,* loan defaults occur — the loss is absorbed first by the subordinated tranches.

45.     Accordingly, the senior tranches are typically rated "AAA" by S&P and "Aaa" by Moody's, the highest credit rating, signifying a lower level of risk.   Meanwhile, the junior tranches typically receive lower credit ratings, reflecting their higher risk.

46.     Following the securitization process, certificates are produced for each of the various tranches, which are then passed on to one or more underwriters.  For the certificates at issue in this case, the underwriter was MLPFS.  The underwriter, in turn, offers the certificates to investors.

47.     As noted above, MLMI filed the Registration Statements in order to sell billions of dollars in MBS through an undetermined number of issuing trusts.

48.     The MBS, which were sold in the form of certificates, were themselves issued pursuant to multiple prospectus supplements, each describing the particular mortgage loans underlying the certificates being offered by that prospectus supplement.   The prospectus contained within the Registration Statements state: "This prospectus may be used to offer and sell the securities only if accompanied by a prospectus supplement."

49.     Plaintiff purchased from multiple offerings made pursuant to the Registration Statements.  Specifically, Plaintiff purchased certificates from the offerings in the chart below:

| CUSIP | Security Name | Prospectus Supplement Filing Date |
|---|---|---|
| 59020U5U5 | Merrill Lynch Mortgage Investors Trust Series 2006-A1 | 3/30/2006 |
| 59020U6L4 | Merrill Lynch Mortgage Investors Trust Series 2006-WMC2 | 3/30/2006 |
| 590210AB6 | Merrill Lynch Mortgage Investors Trust Series 2006-AHL1 | 6/29/2006 |
| 590217AC9 | Merrill Lynch Mortgage Investors Trust Series 2006-RM3 | 6/27/2006 |
| 59021AAA6 | Merrill Lynch Mortgage Investors Trust Series 2006-FM 1 | 6/29/2006 |
| 59023AAB2 | Merrill Lynch Mortgage Investors Trust Series 2006-MLN1 | 9/28/2006 |
| 59023FAA3 | Merrill Lynch Mortgage Investors Trust Series 2006-RM5 | 10/27/2006 |

| 59024QAB6 | Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-2 | 4/27/2007 |
| 59024VAF6 | Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-3 | 5/30/2007 |
| 59025CAB6 | Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-4 | 6/26/2007 |

## V.  DEFENDANTS MISREPRESENTED THE STANDARDS AND PROCEDURES USED IN UNDERWRITING AND, THUS, THE QUALITY AND ASSOCIATED RISKINESS OF THE UNDERLYING MORTGAGE LOANS

50.    The materially untrue and misleading statements contained in the Offering Materials can be summarized as follows: (i) representations and omissions regarding the underwriting standards and practices employed by the loan originators; (ii) representations and omissions regarding the appraisal standards and practices used in valuing the real estate properties acting as collateral for the mortgage loans underlying the Certificates; (iii) representations and omissions regarding the specific LTV ratios of the mortgage loans underlying the Certificates and, relatedly, the appraised home values of the real estate properties underlying those mortgage loans; and (iv) representations and omissions regarding the Certificates' credit ratings, including that the credit ratings agencies providing such ratings were not independent evaluators but rather interested participants in the Offerings.

51.    In reality, these representations and omissions were materially untrue or misleading because, among other things: (i) lenders actively marketed their mortgage products to those that did not meet the prudent and/or stated debt-to-income ratio guidelines reported by the lender; (ii) lenders failed to require adequate documentation from the borrowers to support the income and assets stated in their loan applications; (iii) appraisers were consistently, oftentimes at the behest or direction of the loan originators, failing to provide accurate appraisals in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP"); and (iv) such faulty appraisals not only resulted in the reporting of falsely inflated home values, but

directly resulted in falsely reported LTV ratios.

### A. Representations and Omissions Regarding Underwriting Standards and Loan Practices Used by the Loan Originators

52.    The Offering Materials contain representations regarding the underwriting standards and practices employed by the lenders that originated the mortgage loans underlying the particular certificates being offered.

53.    These representations were untrue because, once lenders shifted their focus from originating loans which they could hold and service to loans that they could quickly sell to banks looking to securitize mortgages, many simply abandoned their underwriting and appraisal standards.

54.    This phenomenon was exacerbated by Merrill, which began pushing lenders for more and more mortgages that it could purchase for its MBS-related offerings.  For example, several public sources have indicated that Merrill used its ownership stake in, and credit lines with, First Franklin as leverage to convince it to disregard its underwriting and appraisal standards in order to increase the amount of mortgage loans generated and ultimately sold in the form of certificates.

55.    Furthermore, Mortgage Lenders Network USA, Inc. ("MLN") filed for bankruptcy protection a few months prior to the Merrill Lynch Investors Trust, Series 2006-MLN1 offering which pooled loans originated by MLN.  While the prospectus supplement for that offering disclosed that MLN had filed for bankruptcy since originating the loans, Defendants failed to mention that this was due in large part to substantial loan buy-back demands made by Merrill to MLN.  Merrill, which was listed as MLN's largest unsecured creditor, purchased the loans form MLN with a provision whereby loans with early payment defaults could be put back to MLN.  Thus, Defendants lacked a reasonable basis to include a substantial portion of loans

13

that were suffering from high delinquency rates and were unacceptable for inclusion in investment grade asset-backed securities.

56.     Similarly, ResMAE Mortgage Corporation ("ResMAE"), the originator for mortgage loans underlying several certificate offerings pursuant to the Registration Statements, such as the Merrill Lynch Mortgage Investors Trust, Series 2006-RM3, filed for bankruptcy. ResMAE filed for bankruptcy, in large part, as a result of significant loan buy-back demands made by Merrill to ResMAE. Thus, Defendants had no reasonable basis for including these loans in investment-grade securities and for not adequately disclosing these problems.

57.     In the end, the loan origination practices of the lenders become so lax that borrowers were being extended loans with little or no down payment based on mortgage applications containing stated incomes and assets that were impossible to reconcile with the applicants' purported employment.

**B.     Representations And Omissions Regarding Home Appraisal Standards And Practices Used When Originating Mortgage Loans**

58.     The Offering Materials all contained representations regarding the appraisal standards and practices used in determining the appraisal values for the homes serving as collateral for the mortgage loans underlying the certificates.

59.     Thus, statements concerning the loan underwriting and appraisals of the collateralized real estate are particularly important to investors seeking to purchase certificates. If the pooled loans backing the certificates were to experience greater than expected defaults, certificate owners would experience losses greater than what could be reasonably anticipated from the Offering Materials. Moreover, should homeowners fall behind on their payments, independent and accurate appraisals are crucial to ensuring that the foreclosed property could be sold at a price that satisfies the mortgage loan.

60.    The representations regarding the appraisal standards and practices were untrue because many of the originators had weak or no controls to confirm that appraisers were following the guidelines described above.  This, in combination with the pressures placed on appraisers to reach the desired home appraisal value necessary to obtain the required LTV ratios, caused the LTV ratios actually reported to be artificially lower than they actually were.  As a result, not only were the reported average LTV ratios false, but the borrowers were not meeting the stated LTV requirements described in the guidelines for particular types of mortgage loans.

### C.    Representations and Omissions Regarding Loan Characteristics

61.    The Offering Materials all contain representations regarding the characteristics of the mortgage loans underlying the particular offering in question.  Such representations include, among other things, average LTV ratios, average debt-to-income ratios and average borrower credit scores.

62.    An accurate LTV ratio is a key risk factor that provides investors with insight into the risk of default on the underlying loans.  The LTV ratio compares the amount of the loan with the appraised value of the property underlying the loan – *i.e.*, if a $90,000 loan is given on a property worth $100,000, then the LTV ratio is 90%.  Thus, a high LTV ratio includes a greater risk of default by the borrower since the borrower has less equity in the property and less of an incentive to pay the mortgage in the event of a default.  Moreover, for a mortgage with a high LTV ratio, even a slight drop in housing prices could cause the balance of the loan to exceed the value of the underlying property.  For instance, if the property originally worth $100,000 is actually determined to be worth $85,000, then the borrower owes more than the property is worth, creating an even greater incentive for the borrower to default and walk away from the depreciated property.

63.    The statements regarding the characteristics of the mortgage loans were untrue

and misleading because many originators were causing home appraisers to artificially inflate appraised home values in order to give the appearance that loan applications were meeting stated LTV requirements.

64.    Originators also actively promoted stated income and other similar types of "alternative" loan practices in order to persuade and/or encourage applicants to provide false loan application information in order to qualify for a loan.

### D.    Representations and Omissions Regarding the Certificates' Credit Ratings

65.    The Offering Materials each listed the initial credit ratings of the certificates being offered by that particular trust.  Not surprisingly, given the role the Ratings Agency Underwriters played in the Offerings, each of the Offerings contained mostly investment-grade certificates.

66.    The statements regarding the credit ratings were untrue and misleading insofar as they: (i) misrepresented that such ratings accurately reflected the quality and credit risk associated with the underlying loans; (ii) misrepresented that certain certificates were investment-grade when they should have been classified far below investment-grade; (iii) failed to disclose that the ratings did not reflect the true likelihood of receipt of all payments on the mortgage loans; and (iv) failed to disclose that the Ratings Agency Underwriters were interested parties, as opposed to disinterested third parties capable of rendering an objective opinion.

## VI.    SPECIFIC EXAMPLES OF DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

### A.    Merrill Lynch Mortgage Investors Trust, Series 2006-A1

67.    On March 30, 2006, MLMI and Merrill Lynch Mortgage Investors Trust, Series 2006-A1 filed with the SEC a prospectus supplement on Form 424B5 dated March 29, 2006. This prospectus supplement purported to offer twelve (12) classes of certificates with an approximate aggregate value of $656,531,100 (the "Series 2006-A1 Offering").  As noted in its

attached certification, Plaintiff purchased certificates pursuant to this offering.

68.     The Series 2006-A1 Offering purported to pool mortgages originated by Countrywide Home Loans, Inc. ("Countrywide"), MortgageIT, Inc. ("MortgageIT"), GreenPoint Mortgage Funding, Inc. ("GreenPoint") and Washington Mutual Mortgage Securities Corp. ("WaMu").  Of this pool, approximately 84.32%, 9.80%, 4.16% and 1.72% of the mortgage loans were originated by Countrywide, MortgageIT, GreenPoint and WaMu, respectively.

69.     Initially, the Series 2006-A1 Offering initially had the following credit ratings:

| Moody's | Aaa   (Top 4 Tranches)<br>N/R   (Bottom 4 Tranches) |
|---------|-----------------------------------------------------|
| S&P | AAA (Top 5 Tranches)<br>AA    (M-1 Tranche)<br>A      (M-2 Tranche)<br>BBB (M-3 Tranche) |

70.     By the beginning of March 2009, S&P had downgraded the certificates in the Top 4 Tranches to "BBB*-" and, by the end of January 2009, Moody's had downgraded them to "B3."

71.     In the prospectus supplement for the Series 2006-A1 Offering, it states that "The Mortgage Loans were originated generally in accordance with the underwriting criteria, standards and guidelines of each Originator."

72.     The prospectus supplement for the Series 2006-A1 Offering describes Countrywide's underwriting standards and practices, in pertinent part, as follows:

> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for

17

the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

\*        \*        \*

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

\*        \*        \*

The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

\*        \*        \*

Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%. Countrywide Home Loans' underwriting guidelines do not prohibit or otherwise restrict a borrower from obtaining secondary financing from lenders other than Countrywide Home Loans, whether at origination of the mortgage loan or thereafter.

73.    The prospectus supplement for the Series 2006-A1 Offering also describes the

documentation required of borrowers to verify their finances and repayment ability:

The nature of the information that a borrower is required to disclose and whether the information is verified depends, in part,

18

on the documentation program used in the origination process. In general under the Full Documentation Loan Program (the **"Full Documentation Program"**), each prospective borrower is required to complete an application which includes information with respect to the applicant's assets, liabilities, income, credit history, employment history and other personal information. Self employed individuals are generally required to submit their two most recent federal income tax returns. Under the Full Documentation Program, the underwriter verifies the information contained in the application relating to employment, income, assets and mortgages.

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "**Alternative Documentation Program**"), a Reduced Documentation Loan Program (the "**Reduced Documentation Program**"), a CLUES Plus Documentation Loan Program (the "**CLUES Plus Documentation Program**"), a No Income/No Asset Documentation Loan Program (the "**No Income/No Asset Documentation Program**"), a Stated Income/Stated Asset Documentation Loan Program (the "**Stated Income/Stated Asset Documentation Program**") and a Streamlined Documentation Loan Program (the "**Streamlined Documentation Program**").

74.      The prospectus supplement for the Series 2006-A1 Offering describes Countrywide's appraisal policies:

Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

75.      The prospectus supplement for the Series 2006-A1 Offering then goes on to disclose the Standard Underwriting Guidelines used by Countrywide to evaluate loan applications. The Standard Underwriting Guidelines were described as "consistent in many

respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie

Mac ….":

> Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.
>
> For cash-out refinance mortgage loans, Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 75% and original principal balances ranging up to $650,000. The maximum "cash-out" amount permitted is $200,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan. As used in this prospectus supplement, a refinance mortgage loan is classified as a cash-out refinance mortgage loan by Countrywide Home Loans if the borrower retains an amount greater than the lesser of 2% of the entire amount of the proceeds from the refinancing of the existing loan or $2,000.
>
> Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 75% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.

The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of

80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

76. In addition to the Standard Underwriting Guidelines, the prospectus supplement for the Series 2006-A1 Offering also described the "Expanded Underwriting Guidelines" used for underwriting loans with higher LTV ratios and to allow borrowers higher debt-to-income ratios:

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with nonconforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 90% and original principal balances ranging up to $1,500,000. The maximum "cash-out" amount permitted is $400,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan.

Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal

balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-

Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculation are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

77. The prospectus supplement for the Series 2006-A1 Offering further represents that "[t]he weighted average [LTV] Ratio at origination of the Mortgage Loans was approximately 74.72%, and no Mortgage Loan had an [LTV] Ratio at origination exceeding 95.00%."

78. These statements were materially untrue or misleading when made because Countrywide, who reportedly has been under investigation by the Federal Bureau of Investigations regarding its underwriting and loan origination practices, did not follow the guidelines and standards discussed above.

79. Countrywide's stated policy was that it could approve loans even if they did not meet the stated criteria outlined above if certain "compensating factors" existed. In fact, Countrywide underwriters were under intense pressure to process and fund as many loans as possible, oftentimes resulting in underwriters processing 60 to 70 loans per day. Indeed, it was

Countrywide's practice that underwriters were forced to show "compensating factors" as to why loans should ***not*** be approved, as opposed to why they should.

80.    In fact, Countrywide marketed its "Specialty Lending Group" to brokers as "knowledgeable loan experts [that] are empowered to review all loan packages, make sound credit decisions and provide quality lending solutions – ***yes, even for 'hard to close' loans***."

81.    Countrywide would underwrite loans based on the assumption that borrowers would not elect the minimum payment option, thus avoiding negative amortization on its Pay Option ARM loans.  At the same time, however, Countrywide actively marketed these loans by emphasizing the minimum payments, thus targeting those individuals who would only be able to make the minimum payment.

82.    Countrywide had weak or no controls to confirm that appraisers were following the guidelines described above.  This, in combination with the pressures placed on appraisers to reach the desired home appraisal value necessary to obtain the required LTV ratios, caused the LTV ratios actually reported to be artificially lower than they actually were.  As a result, not only were the reported average LTV ratios false, but the borrowers were not meeting the stated LTV requirements described in the guidelines for particular types of mortgage loans.

83.    This fact is demonstrated by a "whistleblower" complaint filed by a former regional vice president and manager of Countrywide KB Home Loans, a subsidiary of Countrywide.  The former employee alleged that he had his employment terminated after he complained to his superiors that employees were advising customers to document false income amounts in order to obtain stated income loans and that employees were "strongly advising" appraisers to inflate property values so that loans would close.

84.    Another one of Countrywide's subsidiaries, LandSafe Inc., used industry

blacklists and other devices to force appraisers into inflating home values. According to a complaint filed in Washington District Court regarding this matter, "This also made loans more risky because when [appraisal] values were falsely increased, [LTV] ratios calculated with these phony numbers were necessarily incorrect." It further states, "[t]his practice misled investors who later purchased these loans through securitizations because these investors were not made aware that the actual home values were less than the inflated appraised values."

85.    According to a former Countrywide loan officer cited in a lawsuit filed by the California Attorney General's Office, "[A] loan officer might say, 'with your credit score of X, for this house, and to make X payment, X is the income you need to make.' Many borrowers responding by agreeing that they made X amount in income."

86.    As a result, the debt-to-income ratios reported by Countrywide and utilized as part of the underwriting guidelines provided were misstated due to the manipulation of reported income levels on Countrywide loan applications.

**B.    Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2**

87.    On March 30, 2006, MLMI and Merrill Lynch Mortgage Investors Trust, Series 2006-WMC2 filed with the SEC a prospectus supplement dated March 28, 2006. This prospectus supplement purported to offer eighteen (18) classes of certificates with an approximate aggregate value of $1,205,046,100 (the "Series 2006-WMC2 Offering"). As noted in its attached certification, Plaintiff purchased certificates pursuant to this offering.

88.    The Series 2006-WMC2 Offering purported to pool mortgages originated by WMC Mortgage Corp. ("WMC").

89.    Initially, the Series 2006-WMC2 Offerings had the following credit ratings:

| Moody's | Aaa   (Top 5 Tranches) |
|---------|-------------------------|
|         | Aa1   (M-1 Tranche) |
|         | Aa2   (M-2 Tranche) |
|         | Aa3   (M-3 Tranche) |
|         | A1     (M-4 Tranche) |
|         | A2     (M-5 Tranche) |
|         | A3     (M-6 Tranche) |
|         | Baa1  (B-1A; B-1B Tranches) |
|         | Baa2  (B-2A; B-2B Tranches) |
|         | Baa3  (B-3A; B-3B Tranches) |
| S&P     | AAA    (Top 5 Tranches; Class R Tranche) |
|         | AA+    (M-1 Tranche) |
|         | AA      (M-2; M-3 Tranches) |
|         | AA-    (M-4 Tranche) |
|         | A+      (M-5 Tranche) |
|         | A        (M-6 Tranche) |
|         | A-       (B-1A; B-1B Tranches) |
|         | BBB+  (B-2A; B-2B Tranches) |
|         | BBB    (B-3A; B-3B Tranches) |

90.     By the end of February 2009, Moody's had downgraded the certificates in the Top 5 Tranches to "B2*-" and S&P had downgraded them to "BB*-."

91.     The prospectus supplement for the Series 2006-WMC2 Offering includes the following general information regarding the loan underwriting procedures followed by WMC in originating mortgage loans:

> The Mortgage Loans have been either (i) originated generally in accordance with the underwriting guidelines established by WMC Mortgage Corp. (collectively, the "Underwriting Guidelines") or (ii) purchased by WMC Mortgage Corp. after re-underwriting the Mortgage Loans generally in accordance with the Underwriting Guidelines. WMC Mortgage Corp. also originates certain other mortgage loans that are underwritten to the guidelines of specific investors, however, such mortgage loans are not included among those sold to the Issuing Entity as described herein. The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults. On a case-by-

case basis WMC Mortgage Corp. may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt-to-income ratio ("Debt Ratio"), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address.

92.     The prospectus supplement for the Series 2006-WMC2 Offering went on to make the following representations regarding WMC's application verification and property appraisal procedures:

Under the Underwriting Guidelines, WMC Mortgage Corp. verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC Mortgage Corp.-approved appraiser or by WMC Mortgage Corp.'s in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model.

93.     The prospectus supplement for the Series 2006-WMC2 Offering also made the following representations regarding WMC's appraisal guidelines:

The general collateral requirements in the Underwriting Guidelines specify that a mortgaged property not have a condition rating of lower than "average." Deferred maintenance costs may generally not exceed $1,500. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area. The general collateral requirements in the Underwriting Guidelines specify conditions and parameters relating to zoning, land-to-improvement ratio, special hazard zones, neighborhood property value trends, whether the property site is too isolated, whether the property site is too close to commercial businesses, whether the property site is rural, city or

suburban, whether the property site is typical for the neighborhood in which it is located and whether the property site is sufficient in size and shape to support all improvements.

94.     The prospectus supplement for the Series 2006-WMC2 Offering also made the following representations regarding the application review process and the differing levels of review conducted for different documentation categories:

> The Underwriting Guidelines require that the documentation accompanying each mortgage loan application include, among other things, a tri-merge credit report on the related applicant from a credit reporting company aggregator. The report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most instances, WMC Mortgage Corp. obtains a tri-merge credit score independent from the mortgage loan application from a credit reporting company aggregator.

95.     The prospectus supplement for the Series 2006-WMC2 Offering further represents that "[t]he weighted average Original [LTV] Ratio as of the Cut-Off Date was approximately 82.21%" and that the "weighted average Credit Score of the Mortgage Loans as of the Cut-off Date was approximately 636."

96.     These statements were materially untrue or misleading when made because WMC did not follow the underwriting guidelines and appraisal standards discussed above.

97.     WMC, which since the Series 2006-WMC2 Offering has been sold by General Electric Company following a surge in defaults by borrowers, has filed for bankruptcy.

98.     According to a lawsuit filed with the California Attorney General's Office against WMC by a mortgage insurance company in December 2008, a detailed analysis of 120 loans originated by WMC revealed evidence of "fraud, errors [and] misrepresentations" in the underlying loan documents.  As a result, 30% of the loans insured by the mortgage insurance company were delinquent within eight months of origination.

99.     Furthermore, in June 2008, WMC was sanctioned by the State of Washington Department of Financial Institutions, Division of Consumer Services for deceptive and unfair practices associated with its loan origination practices.  These deceptive and unfair practices were not discussed anywhere in the Offering Materials.

## VII.    CLASS ACTION ALLEGATIONS

100.    Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who acquired the Certificates pursuant and/or traceable to the untrue and misleading Offering Materials, and who were damaged thereby ("the Class").  Excluded from the Class are the Defendants, officers and directors of the Defendants, members of their immediate families and the heirs, successors or assigns of any of the foregoing.

101.    The members of the Class are so numerous that joinder of all members is impractical.  The exact number of Class members is unknown to Plaintiff at this time and will be ascertained only through appropriate discovery.  Nonetheless, Plaintiff believes thousands of members comprise the Class.  The Offerings issued billions of dollars worth of Certificates. Class members may be identified from records maintained by Defendants or agents.  Class members may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

102.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities Act; whether the Offering Materials issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans underlying the

Certificates; and to what extent the members of the Class have sustained damages and the proper measure of damages.

103.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Moreover, as the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for individual Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

104.    Plaintiff's claims are typical of the claims of the other Class members, and the other Class members sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained herein.

105.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

## FIRST CAUSE OF ACTION
### For Violation of Section 11 of the Securities Act
(Against the Individual Defendants, Issuing Defendants and Underwriter Defendants)

106.    Plaintiff repeats and realleges each and every allegation set out above.

107.    This Cause of Action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

108.    This Cause of Action is based solely on claims of strict liability and/or negligence under the Securities Act.

109.    The Offering Materials for the Certificates were inaccurate and materially misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

110.    Each of the Issuing Defendants is strictly liable to Plaintiff and the Class for the misstatements and omissions complained of herein.

111.    The Individual Defendants each signed the Registration Statement, which were untrue and misleading due to the misstatements described above and, thus, is liable to Plaintiff and the Class for the misstatements and omissions complained of herein

112.    The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the structuring and distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.  The Underwriter Defendants were underwriters for the Issuing Trusts and participated in the sale and marketing of the Certificates to members of the Class.  Thus, each is liable to Plaintiff and the Class for the misstatements and omissions complained of herein.

113.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true and that there were no omissions of material fact necessary to make the statements contained therein not misleading.

114.    The Individual Defendants, Issuing Defendants and Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Offering Materials which made untrue and misleading statements and/or misrepresented or failed to disclose material facts as set forth above.

115.    By reason of the conduct alleged herein, each of the Individual Defendants, Issuing Defendants and Underwriter Defendants violated, and/or controlled a person who violated, Section 11 of the Securities Act and is liable to Plaintiff and the Class.

116.    Plaintiff and other Class members acquired Certificates pursuant to and/or traceable to the Offering Materials.

117.    At the time Plaintiff and other Class members obtained their Certificates, they did so without knowledge of the facts concerning the wrongful conduct alleged herein.  Plaintiff and other Class members could not have reasonably discovered those facts until, at the earliest, the fall of 2008.

118.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Materials, within one year after such discovery should have been made by the exercise of reasonable diligence, and within three years of the Certificates being bona fide offered to the public.

119.    Plaintiff and other Class members have sustained damages as the value of the

Certificates has declined substantially since disclosure of the Defendants' wrongful conduct.

120.    Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, Issuing Defendants and Underwriter Defendants, as set forth in Section 11 of the Securities Act.

SECOND CAUSE OF ACTION
For Violation of Section 12(a)(2) of the Securities Act
(Against the Issuing Defendants and the Underwriter Defendants)

121.    Plaintiff repeats and realleges each and every allegation set out above.

122.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of the Class, against the Issuing Defendants and the Underwriter Defendants.

123.    This Cause of Action is based solely on claims of strict liability and/or negligence under the Securities Act.

124.    The Issuing Defendants and Underwriter Defendants offered or sold the Certificates pursuant to the Offering Materials that were inaccurate and misleading and contained untrue statements of material fact, omitted to state facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein

125.    Neither the Issuing Defendants, nor the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were not untrue or misleading or did not omit material facts that rendered statements made therein not untrue and misleading.

126.    Plaintiff and the other Class members can trace their purchases of the Certificates to the defective Offering Materials.  Plaintiff and other Class members did not know of, and could not have reasonably discovered the misrepresentations and omissions contained in the

Offering Materials.

127.    By reason of the conduct alleged herein, the Issuing Defendants and Underwriter Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act and are therefore liable to Plaintiff and other Class members who purchased Certificates traceable to the Offering Materials.

128.    Plaintiff and other Class members who have retained some or all of the Certificates purchased traceable to the defective Offering Materials are entitled to rescind such purchases and recover the consideration paid for their Certificates, plus interest, less any income received thereon.

129.    Plaintiff and other Class members who have retained some or all of the Certificates hereby tender those Certificates to the Issuing Defendants in exchange for the value of consideration paid, plus interest, but less the value of any income received thereon.

130.    Plaintiff and other Class members who have sold some or all of their Certificates purchased traceable to the defective Offering Materials are entitled to damages, calculated as the loss in the Certificates' value at the time of sale, which loss of value was caused by Defendants' misconduct.

131.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Materials and within three years of the Certificates being bona fide offered to the public.

THIRD CAUSE OF ACTION
For Violation of Section 15 of the Securities Act
(Against Merrill Lynch, MLML, MLPFS and First Franklin)

132.    Plaintiff repeats and realleges each and every allegation set out above.

133.    This Cause of Action is brought pursuant to Section 15 of the Securities Act, 15

U.S.C. § 77o, on behalf of the Class, against Merrill Lynch, MLML, MLFPS and First Franklin as controlling persons. Each of Merrill Lynch, MLML, MLFPS and First Franklin, by virtue of its control, ownership, offices, directorship and specific acts, was at the time of the wrong alleged herein a controlling person of the Issuing Defendants within the meaning of Section 15 of the Securities Act, and had the power and influence, and exercised such power and influence, to cause the Issuing Defendants to engage in the violations of the Securities Act described herein.

134.    Merrill Lynch, MLML, MLPFS and First Franklin each had control ownership and positions that made it privy to, and provided them with actual knowledge of, the material facts concealed from Plaintiff and other Class members.

135.    MLML was the Depositor for the Offerings. MLML was responsible for overseeing the formation of the Issuing Trusts as well as the operations of the Issuing Trusts, including routing payments from borrowers to investors.

136.    As a result of Merrill Lynch's, MLML's and MLPFS' wrongful conduct as alleged herein, each is liable to Plaintiff and other Class members for the damages sustained.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

1.    Determination that this action is a proper class action and certifying Plaintiff as Class representative.

2.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.    Awarding Plaintiff and the other Class members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

4.    Awarding rescission or a rescissionary measure of damages; and

5.    Awarding such additional relief as the Court deems appropriate, including equitable relief.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 27, 2009

BERMAN DeVALERIO

Jeffrey C. Block (JCB-0387)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194

Joseph J. Tabacco, Jr. (JJT-1994)
Nicole Lavallee
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Special Assistant Attorneys General
for the State of Wyoming*

37

# EXHIBIT A

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Joseph Meyer, on behalf of the Wyoming State Treasurer, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.    I am the Treasurer of the State of Wyoming and receive and invest all monies of the State, except for the State Retirement funds, through the funds of the State of Wyoming ("the Funds"). I have reviewed the complaint and authorized its filing by Berman DeValerio.

2.    The Funds did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 or any other federal securities law.

3.    The Funds are willing to serve as a representative party on behalf of the class in this action, including providing testimony at deposition and trial, if necessary.

4.    The Funds' transactions in the securities that are the subject of this complaint are set forth in the chart attached hereto as Exhibit A.

5.    The Funds have not sought to serve or served as a representative or lead plaintiff for a class filed under the federal securities laws within the three years prior to the date of this Certification.

6.    The Funds will not accept any payment for serving as a representative party on behalf of the class beyond its pro rata share of any possible recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of March 2009.

Joseph B. Meyer
Wyoming State Treasurer

**Exhibit A**

**Transactions in Merrill Lynch Mortgage-Backed Certificates**

| Security Name | CUSIP Number | Transaction | Date | Number of Units | Actual Price per Unit |
|---|---|---|---|---|---|
| Merrill Lynch Mortgage Investors Trust Series 2006-WMC1 Class A-2A | 59020U3V5 | Buy | 4/2/2007 | 459,156.48 | $100.00 |
| Merrill Lynch Mortgage Investors Trust Series 2006-A1 Series 1-A1 | 59020U5U5 | Buy | 4/29/2008 | 2,542,579.31 | $72.50 |
| Merrill Lynch Mortgage Investors Trust Series 2006-WMC2 Class A2C | 59020U6L4 | Buy | 6/24/2008 | 5,000,000.00 | $43.03 |
| Merrill Lynch Mortgage Investors Trust Series 2006-AHL1 Class A-2A | 590210AB6 | Buy | 6/16/2006 | 1,000,000.00 | $100.00 |
| Merrill Lynch Mortgage Investors Trust Series 2006-RM3 Class A-2A | 590217AC9 | Buy | 11/6/2006 | 616,556.96 | $99.99 |
| Merrill Lynch Mortgage Investors Trust Series 2006-FM 1 Class A-2A | 59021AAA6 | Buy | 6/23/2006 | 1,500,000.00 | $100.00 |
| Merrill Lynch Mortgage Investors Trust Series 2006-MLN1 Class A-2A | 59023AAB2 | Buy | 10/15/2007 | 685,758.65 | $99.03 |
| Merrill Lynch Mortgage Investors Trust Series 2006-RM5 Class A-2A | 59023FAA3 | Buy | 10/19/2006 | 600,000.00 | $100.00 |
| Merrill Lynch Mortgage Investors Trust Series 2006-RM5 Class A-2A | 59023FAA3 | Sell | 12/6/2007 | 415,046.19 | $95.50 |
| Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-2 Class A-2A | 59024QAB6 | Buy | 4/16/2007 | 3,400,000.00 | $100.00 |
| Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-3 Class A-2B | 59024VAF6 | Buy | 5/23/2007 | 3,500,000.00 | $100.00 |
| Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-3 Class A-2B | 59024VAF6 | Sell | 11/5/2008 | 3,500,000.00 | $45.00 |
| Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-4 Class 2-A1 | 59025CAB6 | Buy | 6/18/2007 | 1,000,000.00 | $100.00 |